UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

___

KAREN WITCZAK,

    Plaintiff,

v.                                                    Case No. 06-C-0699

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,
WAL-MART STORES, INC., LONG
TERM DISABILITY PLAN,

    Defendants.

___

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND DISMISSING CASE
___

        Karen Witczak, a Wisconsin resident, brought suit against Hartford Life and Accident Insurance Company (Hartford) and Wal-Mart Stores, Inc., Long Term Disability Plan alleging that the defendants terminated her long-term disability benefits in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. (1988). In this action, Witczak seeks restoration of disability payments pursuant to 29 U.S.C. § 1132(a)(1)(B). Therefore, this court has jurisdiction over her claims under 28 U.S.C. § 1331 and venue in the Eastern District of Wisconsin is proper under 28 U.S.C. § 1391.

        Cross motions for summary judgment are now before the court. The parties agree that the record in this case is complete and no further proceedings are necessary. Thus, the court will resolve this action based on the record provided.[1]

___

[1] At a scheduling conference, the parties agreed that the record is complete. Therefore, the court set a briefing schedule and the parties submitted cross-dispositive motions. (See Doc. # 45.)

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the court construes all facts and reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255. Hence, on cross-motions for summary judgment, the court construes the facts and reasonable inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'r Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The mere existence of a factual dispute is not sufficient to defeat a summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Instead, the nonmoving party must present definite, competent evidence to rebut the summary judgment motion. *Id.*

## II. BACKGROUND

In 1988, Witczak was diagnosed with Meniere's disease, an inner ear disorder causing vertigo, dizziness, headaches, and nausea. (*Id.* at 342-44.) From 1991 to 1996, she maintained active employment with Wal-Mart as a fabric department manager and was able to control her illness. (*Id.*) However, in September 1996, Witczak claimed that she could no

2

longer continue in her position due to the severe symptoms that she had begun experiencing. (*Id.*) Among her self-reported limitations, Witczak claimed that activity worsened her vision, her concentration was affected by severe vertigo, the unpredictability of her dizziness made it impossible to plan her day, and that she could not shower at home independently due to difficulty maintaining her balance. (*Id.* at 435.) Since leaving her position with Wal-Mart, Witczak has not been re-employed. (*Id.* at 342-44.)

Through her employment with Wal-Mart, Witczak was covered by the Wal-Mart Stores, Inc., Long Term Disability Plan (the Wal-Mart LTD Plan), an ERISA-governed employee welfare benefit plan. (*Id.* at 531-600.) The Plan is sponsored by Wal-Mart through its purchase of a group long-term disability (LTD) insurance policy (Policy) issued by defendant Hartford Life and Accident Insurance Company (Hartford). (*Id.* at 531-600.) The Policy grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (*Id.* at 547.)

Pursuant to the terms of the Policy, for an employee to be eligible for LTD benefits the employee must be "totally disabled." (*Id.* at 316.) The Policy defines total disability to mean that:

> (1) during the Elimination Period; and
> (2) for the next 12 months, you are prevented by:
>     (a) accidental bodily injury;
>     (b) sickness;
>     (c) mental illness;
>     (d) substance abuse; or,
>     (e) pregnancy,
> from performing the essential duties of your occupation, and as a result you are earning less than 40% of your Pre-disability Earnings. . . .

3

(*Id.* at 546.) After the initial twelve month period, and for as long as the employee remains totally disabled, the disability must prevent the employee from performing any occupation or work for which the employee is otherwise qualified due to training, education, or experience. (*Id.* at 316.) Lastly, the Policy provides for the payment of LTD benefits to an eligible employee until the first of the following events to occur:

> (1) the date the employee is no longer disabled;
> (2) the date the employee fails to furnish proof that the employee is continuously disabled;
> (3) the date the employee refuses to be examined, if Hartford required an examination;
> (4) the date the employee dies; or
> (5) the date determined from a "Maximum Duration of Benefits Table."

(*Id.* at 580.)

Upon ceasing her active employment with Wal-Mart, Witczak submitted a claim to Hartford for LTD benefits. (*Id.* at 318.) While Hartford began the process of investigating Witczak's eligibility for LTD benefits, it approved the payment of weekly short-term disability benefits through March 19, 1997. (*Id.* at 358, 362.) In April 1997, Hartford informed Witczak that she had been approved to receive LTD payments for the initial twelve-month period, which would retroactively commence as of March 20, 1997. (*Id.* at 318.) Around the same time, Witczak applied to receive Social Security disability benefits, which were approved in March 1997. (*Id.* at 339.)

In May 1998, Hartford advised Witczak that she had been approved for LTD benefits beyond March 19, 1998, and that she would receive benefits for as long as she continued to meet the Policy's definition of total disability, or until age 65. (*Id.* at 308.) From 1998 until 2004, Witczak submitted her Claimant Questionnaire annually advising Hartford

4

Case 2:06-cv-00699-CNC    Filed 04/28/08    Page 4 of 18    Document 63

that she was unable to work. (*Id.* at 229-30, 266-67, 300, 314-15.) And, during that time, Witczak's treating physician, Dr. Steven Millen, submitted annual Attending Physician Statement (APS) forms asserting that Witczak was totally disabled. (*Id.* at 235-36, 243-44, 264-65, 286-87, 295-96, 303-04, 309-10.)

In 2002, Hartford offered Witczak a lump-sum settlement in the amount of $35,500 to replace the monthly benefit payments she was receiving. (*Id.* at 252.) Witczak made a counteroffer requesting a settlement of $43,100, which Hartford refused. (*Id.* at 23.) As a result, Witczak rejected Hartford's settlement offer and her monthly payments continued. (*Id.*)

In August 2004, Hartford claims analyst Todd M. Rupert referred Witczak's claim for investigation upon discovering that Witczak's self-reported limitations appeared "excessive given her diagnosis." (*Id.* at 434 & 485.) Additionally, Rupert noted that Witczak's case file contained no recent test results and that her previous three APS forms just said "no work." (*Id.*) Hartford then commenced an investigation of Witczak's claim in September 2004. (*Id.*)

As part of the investigation, video surveillance of Witczak's daily activities was conducted on September 9 and 10, 2004. (*Id.* at 435.) The surveillance video shows Witczak weeding her flower bed, sweeping her porch, retrieving her mail, carrying out her trash, and shaking out area rugs at her home repeatedly. (*Id.* at 486.) On the second day of surveillance, Witczak was away from her home for over nine hours, performing such activities as climbing to the top of a lighthouse, taking a two-mile walk around a park, and jogging back to her vehicle after visiting a rest stop. (*Id.*)

After reviewing the surveillance video, Hartford contacted Witczak to arrange an interview with one of its investigators at her residence in Fond du Lac. (*Id.* at 487.) The

5

investigator's notes from that interview, which occurred in October 2004, show that Witczak initially used surrounding fixtures to maintain her balance while moving around her home, and that she appeared to have difficultly concentrating during the interview. (*Id.* at 219-20, 487.) After Witczak was shown the surveillance video, the investigator noted that her movements appeared more stable. (*Id.* at 219-20.) In response to the surveillance video, Witczak stated that she had been deliberately attempting to hide her disability on those days because she had company staying at her home. (*Id.* at 465.) Witczak also claimed that the week after the surveillance occurred, she was confined to her bed due to overexertion the previous week. (*Id.*)

Prior to Hartford's investigation, Dr. Millen stated on an August 2004 APS form that Witczak remained "totally disabled." (*Id.* at 235-36.) On November 2, 2004, as part of Hartford's investigation, Witczak's file was reviewed by Nurse Connie Behrle, who concluded that it appeared Witczak was capable of performing full-time sedentary work. (*Id.* at 197-98.) The following week, Nurse Behrle contacted Dr. Millen's office. Though Dr. Millen refused to speak with Behrle, his assistant confirmed that the doctor maintained his opinion that Witczak was totally disabled. (*Id.* at 208.)

On December 10, 2004, Witczak complained of pain in her head, shoulder and back, as well as chronic headaches and fatigue. (*Id.* at 114-15.) She was seen by Dr. Michael Sergi, who noted that Witczak was possibly suffering from fibromyalgia but that further laboratory tests would be necessary. (*Id.*) On January 31, 2005, Witczak paid a follow-up visit to Dr. Sergi. (*Id.* at 113.) Sergi observed that Witczak's symptoms had persisted and that she told him that she felt "scrutinized" and "pressured" by Hartford. (*Id.*) During the ensuing four months, Dr. Sergi began Witczak on antidepressant and sleep

6

medications, and maintained his diagnosis that she suffered from "an element of fibromyalgia syndrome." (*Id.* at 110-13.) Ultimately, Dr. Sergi wrote to Hartford stating that Witczak "has a debilitating illness related to inner ear dysfunction" and that "[g]iven the number of episodes she is having with her associated fibromyalgia," it would be "very difficult for her to participate in any gainful employment." (*Id.* at 89.)

Also in December 2004, Hartford retained Dr. Robert Levine to review Witczak's medical records and surveillance video, as well as to speak with Dr. Millen about his opinion. (*Id.* at 186-88.) After speaking with Dr. Millen, Dr. Levine reported that Millen had not seen Witczak in over a year and that Millen believed that Witczak had "large fluctuations in the intensity of her symptoms." (*Id.* at 199-201.) Additionally, Dr. Millen opined that Witczak was still unemployable and asked, "What employer would take her back?" considering the inconsistency of her symptoms. (*Id.*) Dr. Levine concluded that Witczak was able to perform full-time sedentary work based on his review of her case, which did not involve a personal examination. (*Id.*)

After receiving Dr. Levine's report, Hartford scheduled another independent medical examination by Dr. S. Fredric Horwitz, a neuro-otologist. (*Id.* at 27, 184, 179-80.) Dr. Horwitz's January 2005 examination included a review of Witczak's medical records and surveillance video, as well as a physical examination of Witczak. (*Id.* at 172-76.) As a result, Dr. Horwitz determined that, because Witczak's vertigo was intermittent, she could be free of her symptoms at some times, while having difficulties with her balance at others. (*Id.*) Thus, it was not unusual for Witczak to be capable of performing activities depicted in the surveillance video. (*Id.*) Nevertheless, Horwitz determined that Witczak was able "to function

7

in a relatively sedentary type of occupation . . . that would not require significant changes of position." (*Id.*)

In February 2005, Hartford rehabilitation case manager Larry Underwood issued an Employment Analysis Report concerning Witczak. (*Id.* at 147-48.) Underwood determined that Witczak possessed the transferrable skills to engage in approximately thirty-four unskilled occupations in the sedentary work category. (*Id.*) Noting Witczak's stated interest in crafts, Underwood identified four jobs compatible with Witczak's vocational skills, sedentary work limitations and target gainful wage of $943.09 per month. (*Id.*) For example, Underwood suggested that Witczak could be employed to cut and paste press clippings or monitor surveillance systems. (*Id.*)

On February 15, 2005, Hartford informed Witczak that its review of her claim had shown that she no longer qualified under the Policy's definition of "total disability," and as a result, her LTD benefits would be discontinued immediately. (*Id.* at 141-46.) Hartford based the decision to terminate benefits on its finding that the medical evidence in Witczak's claim file demonstrated her physical capability to perform full-time sedentary work. (*Id.*) Witczak was informed by Hartford of her ERISA appeal rights and invited her to submit any other information relevant to her claim. (*Id.*)

Subsequently, on May 20, 2005, Witczak submitted a handwritten letter to Hartford appealing the termination of her disability benefits. (*Id.* at 128-30.) In the letter, Witczak stated that her symptoms had become more frequent and severe. (*Id.*) In addition, both of Witczak's treating physicians submitted letters to Hartford supporting her claim. (See *id.* at 131-32, 133.) First, Dr. Sergi wrote to Hartford stating that Witczak suffered from insomnia, fibromyalgia, and associated depression. (*Id.* at 133.) Dr. Sergi opined as a result,

8

that "it would be very difficult for her to work on a regular basis." (*Id.*) Two months later, Dr. Sergi reaffirmed this opinion. (*See id.* at 89.) Second, Dr. Millen wrote to Hartford stating that he considered Witczak unemployable due to her chronic problems with vertigo and vestibular migraine headaches associated with Meniere's disease. (*Id.* at 131-32.)

Hartford acknowledged Witczak's appeal and informed her that it required additional time to review her claim because it needed the office notes of Dr. Millen and Dr. Sergi. (*Id.* at 116.) That same day Hartford requested those records. (*Id.* at 123-24). On July 7, 2005, Hartford informed Witczak that it had received the medical records from her treating physicians and submitted her file for further independent medical review. (*Id.* at 96.) The letter advised Witczak to expect a decision on her appeal within three to four weeks. (*Id.*)

In reviewing Witczak's appeal, Hartford commissioned two physicians to conduct independent medical reviews of her case file. (*See id.* at 40-49, 51-56.) Dr. Raquel Ann Redtfeldt, an otolaryngologist, and Dr. Noreen F.B. Ferrante, a rheumatologist, were commissioned to perform those reviews. (*Id.*) Both physicians reviewed Witczak's medical record and the surveillance video, and spoke with Dr. Sergi. (*Id.*) Dr. Redtfeldt spoke with Dr. Millen as well. (*Id.* at 44.) Doctors Redtfeldt and Ferrante submitted independent medical reports on August 22, 2005. (*See id.* at 40-49, 51-56.)

Dr. Redtfeldt, who reviewed Witczak's complaint pertaining to her symptoms of Meniere's disease, found it troubling that Dr. Millen refused to review the surveillance video. (*See id.* at 40-46.) Dr. Millen told Dr. Redtfeldt that his main argument for not wanting to release Witczak back to gainful employment was that he did not believe any employer would want her as an employee. (*See Id.* at 44.) Dr. Redtfeldt concluded that if Witczak really suffered from the ailments that Dr. Millen had diagnosed her with, she would be unable to

9

function as she did in the surveillance video, even on a "good day." (*Id.*) Thus, Dr. Redtfeldt concluded that Witczak had exaggerated her balance dysfunction and would have been capable of sedentary work as of February 15, 2005. (*Id.*)

Dr. Ferrante, who reviewed Witczak's complaint pertaining to fibromyalgia, found that Dr. Sergi's fibromyalgia diagnosis was "based solely on the claimant's subjective, self-reported symptoms," and that there was "no documentation of any objective change in Plaintiff's physical condition or capabilities" relating to fibromyalgia. (*Id.* at 71.) Additionally, Dr. Ferrante noted that, even if the clinical data supported a fibromyalgia diagnosis, it does not appear that the syndrome limited Witczak's activities. (*Id.*) Finally, Dr. Ferrante concluded that Witczak possessed the physical capacity for "full-time light occupational tasks" as of February 15, 2005. (*Id.*)

On August 24, 2005, Hartford sent Witczak a letter upholding denial of her benefits. (*Id.* at 62-64.) The letter explained that the weight of the information and medical opinions, when viewed as a whole, showed that she was capable of performing full-time sedentary work. (*Id.* at 64.) The letter further informed Witczak of her rights to access all information relevant to the decision and to bring a civil action under section 502(a) of ERISA. Upon learning that her appeal had been denied, Witczak filed this lawsuit in the U.S. District Court for the Middle District of California. The case was subsequently transferred to this court.

### III. DISCUSSION

#### A. Standard of Review

Before determining whether Hartford's decision to deny Witczak's continued LTD benefits was appropriate, the court must determine the standard of review to apply to

10

Hartford's eligibility determinations under the Wal-Mart Plan. Generally, district courts apply a *de novo* standard of review to claims involving a denial of employee benefits under section 502(a)(1)(B) of ERISA. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But, if discretionary authority to determine benefit eligibility has been delegated to a claim administrator, a more deferential arbitrary and capricious standard of review is applied. *Id.* at 111; *see also Anthony v. Trombetta*, 102 F.3d 1435, 1437 (7th Cir. 1996). To determine whether delegation of discretionary authority has occurred, courts look to the language of the plan. *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 538 (7th Cir. 2000).

Review under the arbitrary and capricious standard is highly deferential to the decision of the claim administrator. This standard has been characterized as "the least demanding form of judicial review of administrative action." *Trombetta*, 102 F.3d at 1437. Denial of a benefit claim will not be set aside as long as the administrator's denial is based on "a reasonable interpretation of the relevant plan documents." *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960 (7th Cir. 2001). The claim administrator must make an informed judgment and articulate a satisfactory reason for the judgment for it to be upheld. *Carr v. The Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999). The court may overturn the administrator's decision only if it was "downright unreasonable." *Id.* (citing *Butler v. Encyclopedia Britannica, Inc.*, 41 F.3d 285, 288 (7th Cir. 1994)). The district court need not determine whether it would have reached the same decision or relied on the same authority. *Id.*

In this case, discretionary authority was delegated to Hartford as the language of the Plan expressly grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."

11

(*Id.* at 547.) The plain language of the policy demonstrates that Hartford, as claims administrator, was vested with the authority to interpret the language of the Policy and to determine benefit eligibility. Furthermore, the Seventh Circuit, in another ERISA case involving a Hartford group policy, applied the arbitrary and capricious standard to language similar to that at issue in this case. *O'Reilly*, 272 F.3d at 959 (7th Cir. 2001); *see also French v. Hartford Life & Acc. Ins. Co.*, No. 05 C 0975, 2006WL2247248 at *2 (N.D. Ill. Aug. 2, 2006).

Witczak argues that, for Hartford to claim discretionary authority, Wal-Mart must have initially reserved discretion for itself before voluntarily delegating that discretion to Hartford. Witczak contends that Hartford does not have the authority to give itself discretion in a document it created. To support her contention, Witczak relies on several district court rulings from outside the Seventh Circuit; however, her arguments are persuasive.

First, contrary to Witczak's contention that a plan sponsor must reserve discretion for itself before delegating discretion to a claims administrator, at least one district court in the Seventh Circuit has rejected the argument. In *Sanders v. UNUM Life Ins. Co. of America*, 346 F. Supp. 2d 955, 957 (N.D. Ill. 2004), the plaintiff contended that the plan must reserve discretion for the plan sponsor who then must delegate the authority to the claims administrator. However, the district court concluded that there was no reason to question the delegation of discretion found in the plan's language; the language in the policy delegating discretion to the claim administrator was sufficient to warrant deferential review. *Id.*

Additionally, the facts underlying the decisions that Witczak relies on are easily distinguishable from the facts of this case. For example, in *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487 (W.D. Mich. 2006), the court held that the delegation of discretionary authority must be made in the Plan. The delegation in that case was made in a document

12

that was external to the group policy.  Here, however, the delegation of authority to Hartford was stated in the Plan, making *Crider* inapplicable.  Witczak also cites *Robertson v. Broadspire National Services, Inc.*, No. 05-1667-KI, 2006WL2934286 (D. Or. Oct. 10, 2006), in which the claim administrator retained a third party to act as the disability claims administrator of the plan.  The Robertson court held that a claims administrator may not re-delegate its discretion to a third party unless the authority to do so is expressly found in the plan language.  *Id.* at *5.  In this case, because Hartford has not re-delegated its discretionary authority to a third party, Witczak's reliance on *Broadspire* is misplaced.

Lastly, Witczak contends that Hartford has no authority to give itself discretion in a document that it created.  The Wal-Mart Plan represents an agreement between Wal-Mart and Hartford.  Wal-Mart agreed to pay premiums to Hartford in return for Hartford's promise to insure Wal-Mart's employees.  As part of their agreement, Hartford was vested with the discretionary authority to interpret the language of the Policy and to make determinations about employee eligibility.  Hartford did not simply draft a document and retain discretionary authority for itself without deference to the wishes of the Plan's sponsor.  Wal-Mart assented to the arrangement represented in the Policy; thus, Witczak's contention must fail.  For these reasons, the court will apply an arbitrary and capricious standard of review to Witczak's benefit claim to determine whether Hartford's decision should be overturned.

II.  Review of Hartford's Decision

Under the arbitrary and capricious standard, Hartford's eligibility determination will be upheld so long as it was based on a reasonable interpretation of the administrative record.  Hartford's decision will be disturbed only if it is determined that the denial of continued benefits to Witczak was plainly unreasonable.  The record reflects that Hartford

13

undertook an extensive review of Witczak's file prior to determining that she no longer qualified for LTD benefits, and that Hartford articulated its reasons for terminating Witczak's benefits. It informed Witczak of her right to appeal its decision and of her right to file suit in federal district court under the ERISA law. Therefore, after carefully examining the administrative record in this case, the court finds that Hartford's decision to terminate Witczak's LTD benefits was not unreasonable.

In support of her claim that Hartford's denial of LTD benefits was inappropriate, Witczak presents five arguments: (1) there is no evidence demonstrating that her impairments have improved; (2) inappropriately Hartford relied on the reports of non-examining physicians to make its decision to terminate her benefits; (3) Hartford disregarded that she continues to receive Social Security disability benefits due to her condition; (4) Hartford relied improperly on invalid video evidence in denying her continued LTD benefits; and (5) she is totally disabled due to the unpredictability of her symptoms. Each of Witczak's arguments will be addressed in turn.

Witczak first claims that Hartford discontinued her LTD benefits without evidence of any improvement in her condition. To support this contention, Witczak relies on *Nickola v. CNA Group Life Assurance Co.*, 2005 U.S. Dist. LEXIS 16219 at *25 (N.D. Il. Aug. 5, 2005), which held that once a claimant establishes her entitlement to benefits, a claims administrator's termination of those benefits can be viewed with suspicion if there is no evidence of any improvement in the claimant's condition. But Witczak neglects to mention that the court in *Nickola* added that, after granting benefits to a claimant, a claims administrator is not precluded from determining that it "had erred the first time and now analyzed things correctly." *Id.*

14

In this case, Hartford never claimed to base its decision to terminate Witczak's benefits on evidence that her condition had improved. On the contrary, Hartford's decision was based on evidence showing that Witczak was apparently not as impaired as she claimed at the outset.[2] Because Hartford does not contend that Witczak's condition has improved, the reasonableness of Hartford's decision does not give rise to substantial suspicions regarding the motivation for its decision to terminate disability benefits.

Witczak contends that it was improper for Hartford to rely on the medical opinions of non-examining physicians in rendering its decision. She notes that during Hartford's investigation she was diagnosed with fibromyalgia. Further, both of her treating physicians have been consistent in their support of her contention that she is totally disabled.

Regardless, claims administrators are not required to accord special weight to the opinions of a claimant's treating physicians. As stated by the Supreme Court in *The Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." And, as previously noted, in reviewing the decision of a claims administrator under the arbitrary and capricious standard, this court may overturn the administrator's determination only if it finds no reasonable basis in the record to support the decision. *See O'Reilly*, 272 F.3d at 960.

---

[2] Witczak also implies that Hartford may have elected to review her file in retaliation for her refusal to accept their prior settlement offer. This argument is not persuasive, however, in light of the fact that Hartford not only possesses the right to investigate outstanding claims, but also owes a duty to Plan participants and beneficiaries to prevent payment of benefits to employees who are not entitled to receive them. *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006).

15

Here, Hartford relied on the medical reports of three independent physicians as well as a fourth who examined Witczak. All four independent physicians concluded that Witczak was capable of performing sedentary work. Furthermore, while not determinative in itself, the record indicates that Witczak's treating physicians often relied on self-reported symptoms, and not medical examinations and tests, to support their conclusions that Witczak was totally disabled. Thus, Witczak is unable to demonstrate that Hartford's decision to terminate her disability benefits was arbitrary and capricious.

Next, Witczak asserts that Hartford failed to account for her receipt of Social Security benefits due to disability. However, a claimant's receipt of Social Security Disability payments does not direct a claims administrator's eligibility determination under an ERISA plan because a claims administrator is required to consider all of the evidence in the record before it. *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994), *disapproved of in part on other grounds*, *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635 (7th Cir. 2005). Furthermore, Hartford undertook an extensive investigation of Witczak's claim, and determined, based on the evidence at hand, that Witczak no longer met the Policy definition of total disability.

Witczak maintains that Hartford relied on invalid video evidence in denying her continued LTD benefits. To support this claim, Witczak cites *Mennenoh v. Unum Life Ins. Co.*, 2003 U.S. Dist. LEXIS 24601 (W.D. Wis. July 16, 2003), in which the district court held that a claim administrator may not rely solely on video surveillance to deny a claimant's benefits. However, in *Mennenoh*, the claims administrator failed to support its decision to terminate benefits with independent medical opinions.

16

Here, because Hartford obtained the medical opinions of four independent physicians in addition to obtaining the surveillance video, *Mennenoh* is distinguishable. Furthermore, in *Patterson v. Caterpillar, Inc.*, 70 F.3d 503 (7th Cir. 1995), the Seventh Circuit held that video surveillance combined with physician reports was a sufficient basis on which a claims administrator could determine that a claimant was no longer entitled to benefits. Similarly, Hartford did not base its decision solely on the video surveillance it obtained. The record indicates that Hartford undertook an extensive review of Witczak's claim before making its decision based on the totality of the evidence it had collected. In addition to the surveillance, Hartford also considered the four independent medical reports as well as the medical opinions of Witczak's own treating physicians. As a result, Hartford's reliance on the video surveillance was not absolute, and does not render its decision to terminate Witczak's benefits arbitrary and capricious.

Finally, Witczak contends that Hartford failed to account for the fact that the unpredictable nature of her symptoms makes her susceptible to severe and sudden "flare-ups." Witczak argues that it would be impossible to predict which hours she would be able to work, and that this renders her totally disabled under the terms of the Policy.

In light of all of the evidence collected by Hartford over the course of its extensive review of Witczak's claim, it is not apparent that Hartford failed to take this consideration into account. The video surveillance indicates that Witczak is capable of engaging in sedentary work. Additionally, all four independent medical reviews commissioned by Hartford determined that Witczak could perform sedentary work. Dr. Horwitz even noted the unpredictable nature of Witczak's symptoms in his medical report, but he nevertheless believed that she could perform sedentary work. Based on all of the evidence, the court does

not find that it was plainly unreasonable for Hartford to determine that Witczak was capable of performing non-strenuous labor. As such, Hartford's termination of Witczak's LTD benefits was neither arbitrary nor capricious.

Now, Therefore,

IT IS ORDERED that the defendant's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 28th day of April, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE